Good morning. David Thompson. Good morning, Mr. Thompson. We're ready to move to public hearing. Good morning. Is the court open for the plaintiffs? I'd like to try to reserve five minutes if I can for a vote. I'm going to address the two grounds that the district court used to dismiss the complaint in this case, starting with aiding or abetting liability. It is our position that the complaint, fairly read, has detailed allegations that satisfy the customary international law definition of fraying and abetting, starting with mens rea. In the mens rea, we request that the court finally decide that the mens rea for in abetting under the ATS is knowledge. I think we've, Professor Shepard's brief makes that case intrinsically. This court, originally in Dover v. Cal many years ago, found that it was knowledge based on the fraying and disabuse. Since then, it has, the case for acknowledging the mens rea, I think, has become unassailable. What do you think? It's officially alleged. Can you tell me which paragraphs you're depending on in the complaint? Your Honor, the second one. I could do that. There are many specific paragraphs. One of them, if I can start by saying that the basis for the fact that we believe there's knowledge is shown, there's first two main areas. One is the allegations in the complaint that lay out the public sources that CISCO had to know about and must have known about, showing what the Da Zhang program was against the Fallen Guards in China when it entered into the Supreme Court. The State Department, every year since 1989, has described what this campaign of persecution is, has described that it includes torture and extradition killing, enforced labor and the use of psychiatric hospitals. There have been widespread reports in the media. There have been reports in the U.N., reports by U.N. human rights organizations. So CISCO, doing any due diligence, or just existing in the world, would know that. Does it also have to know that its system is being used? Yes. Or does it have to know that its system is being used to round off these people? Or is it, I guess, to me, a unibatic question? Well, I think they have to know that what they have done is facilitating those human rights violations. That's what the customary international law definition is. And I think the allegations here go far beyond that in the sense that what we have alleged is that CISCO knew not only what was publicly available, but they knew exactly what the Chinese requirements were. And they had to know in going through that and identifying the Falun Gong. But the Supreme Court should be able to solve for it, I guess. Well, I mean, it's not just software. I mean, it's a combination. It's an entire system there. And the thing that's important here, I think, is that. One of the things that's very opaque, probably because software is very opaque, is you keep saying that this is being used to facilitate the surveillance and essentially rounding up these people, but how? Well, one of the ways, for example, is that our allegation is that CISCO engineers in San Jose developed the mechanism through software to identify, using the Internet, 90% of Falun Gong followers. And they did that by taking materials supplied by China and other sources and going through. So all that's to do essentially with identifying it and making it possible to find it. Well, that's true. But I think, well, it goes beyond that. I think the system is also connected to the 610 Bureau, for example, which is the bureau that's designed to supervise the persecution of Falun Gong. And maybe one way to look at this is that. It provides more information. Is that a university-specific information as to why each individual did it or something? Well, they collect information about the Falun Gong and about those people and their backgrounds and what they do. And then that is fed into the 610 system where these people are apprehended, detained, tortured, sometimes persecuted. So apprehension, detention, or torture, if you will, makes it possible to identify them. I mean, in the end, that's what we're seeing. Well, we think that there's also some additional information that is also useful in the torture of, in the torture of conversion by torture of Falun Gong. Information on individuals? Yeah, information on individuals that the system picks up. This was designed for the purposes of enhancing this persecution of this group. I mean, it's a story. In the modern day, if there was an inquisition, this is an inquisition against the Falun Gong and what CSCO has done is look at this. I don't know. Are you or are you not contending that simply assuming that persecuting in the sense of rounding up and arresting and punishing in some way, but not through open force or things like that, people on the basis of their religion, is itself a crime against humanity? Well, I think religious persecution is a crime against humanity. Is that part of your narrative? Yes, it is. In other words, the reason I use that. No, you think it is. I don't know if it is, but. Our position is under the Historic International Law, that a crime against humanity includes religious persecution, and this is what. And it would include rounding people up and arresting them and punishing them either through open force or. I mean, that would be, that obviously would be a different case from the one that we've alleged. I mean, I believe that. It's part of the system. Right. We allege beyond that in the complaint. We allege not only that it goes beyond arrest. It goes into detention without a charge or trial. It goes into forced conversion and all these things. And our allegations are that CSCO knew all of those things, both from public sources and from the sources it got in order to create the system that was specifically designed and customized for the Chinese for these purposes. Mr. Hoffman, if we conclude that there is a respectable authority for this, that it is rightfully held in detention, do you think your allegations are sufficient to support a case of intent? Well, yes, we do. And the reason we do it, first of all, there are basically three menarche mens reas. I mean, there's the mens rea of specific intent or sharing the mens rea of the ultimate perpetrator. So there's this grotesquely, essentially eliminated that as the mens rea for ATMs because that was what the case went up on. We said we didn't have that specific intent. We declined to amend our complaint. And the Ninth Circuit panel decided that we were right with that. We were able to show purpose. And in this case, we showed purpose, I think, by the fact that CSCO and the Chinese government became essentially partners of this in enacting the proportions of the Golden Shield with anti-Falun Gong features that only CSCO had, which is customized, and these are features that the Chinese didn't have at the time, in order to perpetuate this campaign of persecution against the Falun Gong. And therefore, in order to make money, right? Correct. But you would argue that's sufficient if it's the money they want to make is money. Well, we certainly don't think we have to show that they hate the Falun Gong. I mean, basically, what they did is they understood, they knew that they were intentionally facilitating a campaign of persecution that included torture and others. How is that different from college, exactly? Well, I think that the difference is they are exploiting the style of labor because they wanted to keep the prices down. And so in that sense, they had a purpose of, I guess, they didn't care if it was child labor or it was mother sheep labor, but they knew it was child labor and they preferred it over the other options. Well, but if you apply that, I don't know that the diversity necessarily points are really criteria. I think that they're more how purpose is shown in that context, which was purchases versus sellers. For example, in this case, you have Cisco having control over information that it only had, or technical ability it only had, which could have withheld and not applied it to this campaign of persecution. It could have given a crime control system that it would give to any country. And I don't think we have the same case there either. What we're talking about is customization. We're talking about training. The Cyclone V case, for example, the gas, the materials that were given by the defendants in the Cyclone V case were disinfectants. They had a general use, but they gave them to the Nazis in vast quantities, knowing what was going to happen. And they also trained, and in fact, Cisco trained, Chinese security officials on this system do, which would enable them to make better use of finding more Falun Gong members that they could then subject to these kinds of human rights violations. The other thing is that with respect to the Nestle criteria, it's certainly the case that Cisco benefited greatly from designing the system in order to advance the anti-Falun Gong goals, because China said we want a system that will, in part, advance the persecution of Falun Gong. And they did it, and they made money because of that. If they had just given a different kind of system, they wouldn't have made as much money, and they might not have gone on trade into China, which I'm sure is what they wanted. They made lots and lots of money because of that. It's possible that the law will be useful in the future, in any case, for liberation. If that were to be the case, do you think individuals would be able to solve it? In fact, you might say there's two options. Yes, there's the three-individual, and no, there's the four-individual. I think that there are, generally speaking, some modifications, particularly against Mr. Chambliss. And we have specific allegations in the complainant that lay out what he did and the ways in which he personally inhibited and abetted the violations that are under the Torture Victims Protection Act. First of all, we're debating if that is an area of liability under there, and then... I'm not saying that it would be an area of liability. It's just an area of appropriation and the importance of communication. I think it depends on the facts. I mean, we've only named two defendants, and I think that those are appropriate defendants given their role in this case. I don't know how much farther down it would go under the TPJ in the context of appropriation. There's really not a lot of law that, for several years, has been bigger than the country in which those have been seen under the TPJ. Thank you. Just quickly on that point, do you want to comment on whether it would be outdated or at least wise to await the Supreme Court's decision on corporate liability? Well, I don't think so, Your Honor, because, I mean, obviously, there's a schedule, but... I mean, I'm pretty confident that the second time around, the result will be good. Corporate liability is going to pay off. One has to be in this line of work, Your Honor. But, you know, I think that... No, I mean, obviously, the court can do that, but I would hope the court would not do that and would go on to decide these questions. Let me say a word about extraterritoriality, if I might. On extraterritoriality, our position is that the tension-concern test is the test. We think that the Alshamara analysis is the analysis that should be used, and the main reason for that is because it's the most consistent with the history and purpose of the Alliance for Extraterritoriality. And there, I think that what the founders were concerned about were actions that might bring the United States into conflict and, therefore, actions by U.S. citizens, be they corporations or individuals of kind involved in this case, which is not just about U.S. citizenship, but U.S. citizenship plus significant conduct both on U.S. soil and abroad. It's exactly the kind of thing that would have brought conflict in those days and should be. And, therefore, the Alshamara approach, which looks at all of the relevant connections between the United States and the ATS-5, is a more appropriate one. And as we've said there, we think we also meet the narrowest test, which is the test that had been employed by the Second Circuit adopting Justice Scalia's current opinion, which basically requires us to show that there's international law violation on U.S. soil. And we believe there's enough hating and abetting allegations of conduct in the San Jose that would constitute hating and abetting under the customary international law definition. And, therefore, there would be no extraterritoriality problem by collecting citizens. Yes. One question I don't know. Sir. I can understand that answer, but on the end of the District Court, the Court of Indigent, what was the argument made about a local jurisdiction like Texas State? The District Court didn't address that. I'm sorry. They're raised by Cisco as an alternative and they didn't address the difference that they were going to decide on their own. Thank you. Good afternoon, Your Honors. I am pleased to report Kathleen Sullivan for Cisco. Good to see you, Your Honor. I'd like to suggest that the Court should begin where Mr. Hoffman ended, and that is with the words United States, or in this particular instance, the words San Jose, because that's the easiest ground for you to affirm here. The plaintiffs failed to allege conduct in the territory of the United States that constitutes aiding and abetting the alleged international law violations here. And, after Kiobel, that's essential for the survival of their claim because Kiobel answered the question, does the alien for extension apply to conduct in foreign territory? Clearly, in the negative, it said no. So you can disregard, Judge Tima asked where in the complaint should you look. I'd respectfully suggest that you need to disregard seven-eighths of the complaint off the bat because it profused conduct within the territory of the People's Republic. Once you ignore that, then the question becomes, after Kiobel. And the activity, meaning the enforcer and so on, or the activity meaning the design and devising of the system? Your Honor, that's the second key reason why you should affirm because the only conduct left in San Jose is about identifying. It's not about facilitating torture. There's a fundamental disconnect between the use of internet infrastructure to identify and the use of any American technology to torture people. I want to say that we have a lot of cases in immigration law about persecution, right, in which my understanding is that somebody who identifies or makes lists about who's he being to change the torture, and knowing of it to be torture, should be being changed first. You're right, Your Honor, but that's not alleged in this complaint. And I'd really urge the Court to look at the clauses of action in the complaint that appear in the excerpts of record beginning at page 101 and continuing for ATS purposes through page 106. And if you look at those, Your Honor, you're going to see that every single one of the allegations of the international law violations here is about torture, forced labor, forced conversion, extrajudicial killing, while in custody.  The first clause of action, the international law violation that is claimed, it's on ER 101, it's torture while in custody. And let me say, of course, Your Honor, it's odious to contemplate the conduct that is described in this complaint under our system of freedom of religion. The question is, is this lawsuit appropriate against a company that lawfully exports internet infrastructure to China? Your Honor, the fundamental disconnect here is that this is not a persecution complaint. It's a torture while in custody complaint. If you look at the second, sorry, skip the second, go to the third clause of action, cruel, inhuman, and degrading treatment while in custody. If you go to the fourth clause of action beginning on ER 103, you'll see forced labor in labor camps. If you go to count five, you'll see arbitrary and prolonged detention in labor camps. If you go to count six, six clause of action, you'll see crimes against humanity through all of the above, and then adds forced exile, transfer of disappearance, and then at the tail end of the six clause of action. Okay. How do we know the cause of action here for aiding and abetting? That's right, Your Honor. But it's got to be aiding and abetting the international law violations that are pleaded, which means aiding and abetting torture and forced labor. Not aiding and abetting identifying, surveilling, or monitoring. If there was an international law violation about aiding and abetting identification, that would be a different case. But it's not this case. You're bound by this complaint, Your Honor. My understanding is that their claim is, and this is really as complicated as it is, that you're aiding and abetting the torture by aiding and abetting the identifying. That's right, Your Honor. That is their claim. So if you're suggesting that really there's a territoriality problem, it's an issue about aiding and abetting, what is it? It's both, Your Honor. Here's what I would suggest is the legal framework that now binds the court after RJR Tobisco. The first question is, is there domestic conduct that has been plausibly alleged that itself violates the law of nations? For these purposes, Your Honor, none of the principled conduct is in the United States. It's in prisons and labor camps in China. Well, my understanding is that, as I understand it, that creating a system that aids in identifying and rounding up these people is itself aiding and abetting and, therefore, aiding an international violation and, therefore, is itself an international violation. That's exactly right, Your Honor. That's exactly right. We're all in this together. But here's why you're still a part of this. If we were not going to factually examine the areas in the U.S. for the purpose of committing to a genocide to drop below Syrians, would that not be committing an act in standardizing the needs and the needs of an international violation? Yes, it would, Your Honor, and that is not this case. Here's the difference. Here's the difference, and it's very important. First of all, what you've posited is a purpose to assist torture. To answer Judge Tichina's question here to Mr. Hoffman, this complaint comes nowhere close to alleging that John Chambers, the CEO of Cisco and high executive of Cisco, intended to aid and abet torture. That's a ludicrous and offensive suggestion. But you said purpose to torture. Yes, Your Honor. Yes, it could, Your Honor. If there was aiding and abetting of torture through conduct that took place in the United States, if you manufacture something in the United States as a U.S. company and ship it abroad for the sole purpose of committing international law violations against people in the other country, of course that could constitute aiding and abetting. Those are the facts. This is manufacturing or developing an intelligence device that is ordered by the procedure for the sole purpose of identifying people with a preexisting body. That's the facts. Let's go back two steps, Your Honor. First of all, if you're talking about a single purpose device, a device that can only be used to torture people, then that's a different case than you can infer purpose from knowledge. But I want to go back to the important first step. What you need to ask here is whether there's conduct in San Jose that aids and abets the ultimate human rights violations here. And there's not because. Just tell me for a minute. You're not contending that the design of this system didn't take place in San Jose? We absolutely are, Your Honor. We absolutely are. Let's go. I would like to ask how does the design of the system, the gold shield system that was used to identify these people, is there a question about where that happened? Your Honor, the creation of the gold shield cannot possibly give rise to liability here. That's no question. I was just trying to get some baseline. Your Honor, what is the baseline? Whether that's enough, not whether it happened here. Let me suggest what would be enough. What would be enough to satisfy a two-pronged hypothetical would be if the defendants in San Jose created and exported technology for the sole purpose of torturing Falangani in prison. That's the facts of every case that's allowed post-KML, has allowed an ATS brief to proceed. Let's think about it. If you go to the cases we say in the brief at page 9, these are the only cases that have been held to overcome the presumption against extraterritorial implication. And you can think about those as sort of torture Inc. being established in New Jersey, or genocide Inc. being established in Massachusetts. That should be the whole question. You start with the extraterritoriality, but unless we know what ending and abetting is, then we can't really decide the extraterritoriality question, because if the ending and abetting is itself an actionable, you know, negative or customary crime or whatever, under these circumstances, then it didn't happen either. But, Your Honor, let's start with Madre and Actus Reis. Well, I mean, I don't know, because you just, a minute ago, you said that's right, but if I say it again, you're going to say something else. But that's, my understanding is that the, their theory is that what they did in San Jose was acting, and the ending and abetting was in the meaning of the international customary law, and therefore what they did in the United States is, in fact, overcomes extraterritoriality, because it itself was a crime against humanity or whatever. That's what they're arguing, and it's wrong. You can do it in either order. I would suggest that if we can't decide if it's wrong under the extraterritoriality, we have to go with the ending and abetting. You don't, Your Honor. What I would respectfully recommend is that this Court adopt the same approach that the Second Circuit did in Mustafa and Balintulo, that the Fourth Circuit adopted in Orfa, and Ascus and the Fifth Circuit adopted in Adhikari, and ask first, is there a strong and direct connection to the United States? That's the threshold question. We are not in the International Criminal Tribunal for anything. We are in the United States federal courts, and in the United States federal courts, you need to find that there is domestic conduct that has been pleaded that has a strong and direct connection to the United States. That's the first question. Only then do you get to the far and long question. Now, at a minimum, the conduct in the United States has to be ending and abetting under international law, but the cases have clearly held, and we believe correctly, that there has to be a strong and direct connection to the United States. Even beyond that, and here's why. Because, remembering Justice Souter's erudite opinion of the Court in Sosa v. Alvarez-Machin, he said, when we're in an alien court statute case, we have to worry about friction with foreign nations. We have to worry about friction between the courts and the political branches. And this is a case in which Cisco sells lawful internet infrastructure that has been expressly allowed by the United States government through four administrations. Go back to the Tiananmen Square Act under George H. W. Bush, and right through President Obama's and Secretary Kerry's administration in 2010, the United States has continually allowed, expressly allowed, American companies to sell internet technology to the Chinese government, even while knowing about human rights abuses. But internet technology, on your own theory, are they internet technology that such things create at the expense of torture? Quite the opposite, Your Honor. The instruments of torture are… I'm not talking about the facts of this case. I'm talking about the hypothetical. I'm sorry, Your Honor. Say again. The hypothetical in which the… I'm simply saying that the broad permission to sell internet technology to China just includes the… Absolutely, Your Honor. Absolutely. But here's the key point. China, we submitted an expert declaration. It's in the Supplemental Excerpts of Record. The other side didn't put it in that expert declaration, and it makes clear two things. Falun Gong is illegal in China. Torture is illegal in China. If an electronic surveillance company sold equipment to the Chicago police to help round up gangs and helped create signatures to find gangs, and some rogue police would later torture a few people while in prison in custody, we wouldn't say that the company had aided and abetted the police merely because of knowledge. Your Honor, I asked Mr. Hoffman whether his theory was that the rounding up of people for their religion wasn't self-evident. It's impossible. It isn't. It couldn't be. Your Honor, we fundamentally disagree that that's believed in this complaint. This is a complaint. Remember the history of this complaint. He said it was a very false claim, but it is clear to me that it would in itself be… Your Honor, that would be a different case. But let me say that this is not a case… How do you know that, therefore, they're rounding up people because of their religion? I hear you, Your Honor, and it wouldn't be in our system. There are a lot of things in our system that the French believe in rounding up people who send neo-Nazi stuff over the Internet. The British believe in rounding up people who encourage jihad over the Internet. We don't agree with those things, but other systems might, and it is not up to a United States company to determine the foreign policy of the United States. If the foreign policy of the United States said it's okay to sell Internet equipment to France, Britain, and China, then this Court should not create a lavish, new, lenient, even intermittent case based on international tribunals to allow students to… If you had a system where you could identify Jews in Europe to be rounded up, you send them to a, what do they call it, a concentration center. To one of those facilities. You just learned about it. We need to calculate it. And if we would, by definition, enterize the Internet, enterize it, and sell it, then surely it's within the specific purpose of rounding up Jews who would then, when Europe opens up to concentration camps. Your Honor? That would be a violation of international law. That would lead to getting a vetting violation of international law, but you've got two things in there that this case doesn't have. One, you hypothesize that you knew that the rounded up people would be sent to concentration camps. But no, no, Your Honor, they haven't played with that. If you look at this complaint, there's no connection. If I leave you with nothing else today, I want to go back to your first question. And that is, there's a fundamental disconnect between identifying members of Falun Gong, which clearly is a perfectly lawful means of re-education or punishment under Chinese law. They wouldn't be our system, but they could be lawful. There's a fundamental disconnect between saying that the identification then is what enables the torture. The torture takes place far away in time and place. It's done exclusively by Chinese actors in Chinese locations, in Chinese prisons, in Chinese labor camps. Is that correct, Your Honor? Your Honor, that's too loose. In fact, if you want to say that actors raise the law, I think the first thing is there are rules of the immigration law. But, Your Honor, that's too loose here. And let's go back to where we are. Let's remember, Mr. Hoffman didn't mention Kia Bell. He and I spent a lot of time litigating Kia Bell against each other a couple of rounds. Kia Bell made a fundamental difference in the way that this case gets to be viewed. When the plaintiffs first filed the complaint, they didn't have anything in it about San Jose. They were allowed to refile after Kia Bell, and they spliced in some generic language about San Jose. You cannot find a strong and direct connection to the United States from the language about San Jose. And I'd like to take Judge Tsushima's question up. What paragraphs would you look to? And don't take it from me. Take it from Mr. Hoffman. Because he just wrote you yesterday, and he told you that the Kia Bell case resides in a few paragraphs. And those paragraphs are 95, 97, 102, 127, 129, 147, and 174. And I would suggest, Your Honor, suspectfully, when you look at those paragraphs, you will not think for a moment that this is a case that has been pleaded with particularity as to U.S. conduct. Judge Reinhart, your case might exist if there was pleading, but there was people gathered in San Jose to create a device to round people up in China. That's not stated in those paragraphs. What's pleaded in those paragraphs is the most vague and generic allegations of ordinary business conduct in San Jose. 95 refers to high-level designs. 97 refers to the express or implied authority from defendants in San Jose. 102 refers to ongoing involvement by San Jose. 127 refers to high-level design and decision-making. 129 refers to orchestrating from San Jose. 147 refers to a research center. And 174 refers to shareholder meetings. The point after Kia Bell is, whatever Mr. Hoffman might have alleged and Ms. Marsh might have alleged, with respect to whether there is an international law violation, you have a threshold obligation to decide if the U.S. conduct as an application of the ATS touches or concerns the United States with sufficient force to overcome the presumption against extraterritoriality. And the reason for that is you are not permitted, after Kia Bell, to use a tiny tail of U.S. conduct to wag a giant dog of foreign international law violations. And this isn't even a tiny tail. It's a peering tail. These are generic allegations that wouldn't rise to the level of particularity or they're all conclusory. So the District Court, with respect, properly dispensed for lack of domestic conduct that was sufficiently well-planned. We urge you to look at the remand decision at Doe v. Nestle, which we submitted to you in a 28-J letter on Friday because we think it applies the right approach. Start with the question of do we have U.S. conduct. And then, Your Honor, we still think we might, even if you just look at Venn's right on aiding and abetting, because aiding and abetting identification, if you assume that many government actors will act lawfully with respect to the apprehended people, some government actors may act unlawfully under Chinese and international law, that's not Judge Blackhart's case where we think that the government actors will entirely act unlawfully and torture people and kill people and gas people. That's not this case. Lawfully is grounding these people and putting them in jail and not torturing them. That's right, Your Honor, under Chinese law. That's American policy. Four administrations, from Bush 41 through Clinton through Bush 43 and Obama, expressly allowed, after Tiananmen Square, U.S. technology companies to send internet infrastructure technologies and services to China. May we ask you not to ground out people because they're religious, which I understand is not this case, but that's not very helpful. I think, Your Honor, there is a serious, if you have any doubt about affirming it, I think it's fine with us. If you want to wait until the Supreme Court decides Arab Bank and see if the initial argument in Key of L prevails and the accounts to the corporation, with respect, Your Honor, the allegations against the individual defendants here are ludicrous and have to be dismissed. Freddie Chang is entirely acting in China, and the idea that John Chambers, the CEO, by running his company, has aided and abetted supposed torture created by engineers, mostly in China, that doesn't come close to stating an allegation. So, we think you can affirm the individual dismissals now. Just to get back to the mentor, Your Honor, do you maintain that if knowledge weren't standard, you didn't meet them? We do. Okay. Here's why. As you said in the first question, it has to be not knowledge that some unnamed Chinese actor is out there somewhere in the world based on some kind of information to commit torture. It has to be knowledge that your technology is being used to facilitate torture and forced labor. And there's no connection. There's not a single causal connection, even assuming that the knowledge standard is the standard. We think the standards are on purpose. But even assuming it's the standard. Okay. And the ratio of these public sources of knowledge that are behaving in Hong Kong or in the States. Just like you could look in any newspaper today and see that American police commit excessive force against certain minorities and against certain gangs. Because a company that sells cruiser cars or surveillance cameras or computer technology to hook the patrol car up to the squad room is aiding and abetting the use of excessive force. They're aiding and abetting the law enforcement. Goldenfield is a law enforcement device. Cisco sold networking equipment. It was part of a multi-vendor product. If you want to embargo Cisco through allowing the students to proceed, the allocations are not specifically directed at Falun Gong. That's what I'd like you to look at. Now we're at the heart of it. What you need to look at is a kind of intersection of three things you have to understand. U.S. conduct that is not conclusory and that is Falun Gong specific. And I've guided you to Mr. Hoffman's best paragraph, the one he pointed to in his F28J letter yesterday. It is not there. There is nothing specific there about how Falun Gong was identified through these techniques. Remember, what is a network doing? The network, the government right now is guarding your e-mail through network administrators who are keeping your e-mail from being attacked by hackers, malware purveyors, senders of unsolicited marketing messages and, you know, dangers to your system. That's what Cisco sells. The idea that anything was customized for Falun Gong would have to be particularized. And it is. I should say there is a Cisco employee's trade in China. That's in China. Look at all these paragraphs. I guarantee they're going to take you to one of three places. They're going to take you to China, end of case, Kiabo. Or they're going to take you to generic conclusory allegations about general, ordinary business conduct, end of case. That's not nearly enough to be the strong and direct connection to the U.S. test. Or they're going to lead you to something that's just about a perfectly lawful use of Internet technology to identify, which is disconnected, fundamental causal disconnect for actus reus, fundamental disconnect in the knowledge requirement if you're looking at mens rea. If I am seeking to help identify people who might be, who I believe, I'm entitled to rely on my government, which lets me sell this technology, and the Chinese government that bans torture. I'm not supposed to assume the Chinese government is going to violate its own law based on newspaper reports. There has to be something else. That's ridiculous. You're saying there wasn't violation. You're saying they wouldn't violate a newspaper report. Relying on newspaper reports is not enough to show that they acknowledge that Cisco technology would be used to commit international law violations. The Chinese government was apprehending Falun Gong before and after some of the technologies that are alleged here. You'll hear about a technology called Iron Port in paragraph 397C. That wasn't even acquired by Cisco until 2007, and yet Do 9 pleads that Do 9 was tortured by China starting back every year since 2000. There has to be a pleading that there's something particular to Cisco, particular to Falun Gong, and particular to San Jose, that isn't just conclusory for this complaint to survive. Respectfully, I'd suggest that there's been no case that has allowed an ATS case, post-Kyobel, to proceed against a U.S. corporation for selling lawful equipment to a foreign country that has an innocent or appropriate or legitimate use. It's legitimate to use surveillance in law enforcement. That's how government is operating today around law enforcement. And if you rule, if you were to rule that this case could proceed, then it's as if the court is setting up a judicial embargo that displaces the decisions of foreign administrations in the United States and says that all the vendors who've attempted to create an open Internet in China for the benefit of China and the world will be embargoed from selling Internet equipment to China. Why? Because they know that China tortures Falun Gong. Dell, Intel, HP, Ericsson, Fortinet, IBM, Microsoft, Goldenshow is a multi-vendor product, a project to the extent it involves U.S. companies. And if Mr. Hoffman is allowed to say knowledge about torture of Falun Gong is enough to create an ATS case against a U.S. company that just sat in San Jose and had high-level design of ordinary Internet infrastructure, then we have a very serious problem. And I suggest you don't reverse without at least letting the district court decide the undecided political question and not just disability decision. So, Your Honor, just to summarize, I recognize I'm asking you to bring the law up in the circuit in conformity with Kiev, Bell, and RJR Nabisco. I think I would respectfully suggest that the order you should do is this, extraterritoriality first, actus rea second, pens rea last. I know that it's a difficult issue on the circuit, whether the standard is purpose or knowledge, whether to agree with the Second Circuit and the Eleventh Circuit and the Fourth Circuit, or to agree with the D.C. Circuit. But I don't have to reach there. Just say... Maybe you can tell me again how we can decide whether it's extraterritorial until we know what happened. What happened was a crime. Assuming for the purposes... That was a crime here. Here's how I would do it, Your Honor. Because your ultimate argument, I mean, I gather your argument is that even if it is an incognizable crime that was committed here, it still just meets extraterritoriality for some reason. Even if... Okay, here's how I would do it. Even if... We don't think that the allegations here plead a violation of international law because they don't plead that Cisco acted with knowledge that its technology, which had a legitimate law enforcement purpose, was being used to facilitate torture. And you can't infer that knowledge from knowledge of torture. It has to be knowledge that is specific to the use of the technology. If China can torture Falun Gong without using the Cisco technology, you have to show that Cisco knew that the technology was being used. That is a plea to do. Actus Reis, assisting the lawful identification of gang members in Chicago or jihadists in London or neo-Nazis in France does not mean that you know that they will be tortured. Even if you have heard news reports that sometimes members of these groups are tortured, it does not follow. So we think you could end the case with Actus Reis, I don't know if you have any antibiotics, but it is effectively IDing as well. I agree. It's hypothetical about creating an identification system, for instance, in Germany or in Poland. And in these cases, they'd always suppose a racial restraint. Your Honor, I think that the hypo, the way Judge Reinhardt set it up, said that there was knowledge that the government was using the identification mechanism in order to torture. That's not alleged here. How do I enforce that, Your Honor? Round them up. Yeah. Your Honor, if there were a different complaint and the complaint was about persecution and rounding up, that would be a different case. But the complaint here is that there was torture in prison. There was forced labor in camps. And the connection is too attenuated for an ATS bite. And here's where I would suggest extraterritoriality as extra bite. We don't think this pleads the case under international law. But before a United States court delves into which channel of the ICTY has the standard correctly, we respectfully suggest that the U.S. Supreme Court has directed that you see, is there U.S. conduct with strong and direct connections to the United States? And if you look at the rare cases where that's been found, they're collected in footnote 9 of our red brief, they're cases where a guy is sitting in Massachusetts letting a genocide ache to round up gay people in Uganda. There's a group who's forming in New Jersey to raise funds for a foreign terrorist organization in Sri Lanka. It's the company that is hiring the interrogators in the United States to go torture people in Abu Ghraib, where there's that kind of U.S. presence in which the thing that is done in the United States is connected to the ultimate torture. That's a different case. But to align a great American company like Cisco or any of the other companies in the valley and up in the outermost coast that have created the Internet in China and to say you've now aided torture by selling Internet equipment would not only create a judicial embargo in connection with the policies of the United States political branches, it would actually hurt the interests of the world in making sure that China is part of the global open market future of the Internet and doesn't go into creating its own dark Internet where I guarantee you Falun Gong would be worse off. For all those reasons, Your Honor, we respectfully request that you affirm. Start with extraterritoriality and you'll be conscious. Look at the paragraphs I've cited to you, and there's no way that they rise to the level of strong indirect connection like just Reinhardt's hypo or like the cases in Fortnightline. They're too generic. They don't have anything in San Jose that's equivalent knowing that your technology is going to help send juice to the camps. They just don't have it. And the reason why, Your Honor, I think the extraterritoriality argument adds extra bite beyond aiding and abetting is because we're in the alien torture issue, and it's a creature of federal common law. And SOSA told us that we should be very careful in alien torture statutes not to create causes of action that create frictions with political branches or foreign nations. Do you want to add to that? Yes, Your Honor. I think we probably need to stop, but you think the RTR changed the territory here, and I understand that it uses the word focus and applies it to the alien torture claim statute, but what is the focus? I mean, the problem is ultimately it is a jurisdictional statute. You're right, Your Honor, but let me remind you, RTR does answer one question in Doe v. Nestle very clearly and overrides it. Doe v. Nestle said we don't have to look at focus because it's a jurisdictional statute. RTR says clearly the opposite. RTR says we must ask whether the presumption against extraterritoriality has been rebutted, that is whether the statute gives a clear affirmative indication that it applies extraterritorially, regardless of whether the statute in question regulates conduct, affords relief, or merely confers a distinction. So that's just the holding of cable. That's just the signing of cable. But then if you're going to use the focus standard to do it, then you need to tell us what the focus is. I'll tell you what the focus is, Your Honor. It's is there a violation of international human rights law? And here the question is, in the United States, is the conduct in the United States sufficient to be an event to lift violations of international law, which are here not about roundup. They're about torture. Okay, so that's step one. I would say the focus is also, and this is where I keep going back to Sosa, the focus is also on, did Congress intend you to create federal common law that allows a cause of action that's going to cause friction with foreign policy and with the political branches? Allowing this cause of action does both, because it says government was wrong to let Cisco and all the other companies I listed sell internet infrastructure to China. You should have barred them. When they barred brass knuckles and infrared technology and fingerprinting technology, they should have barred networking technology, too. This Court shouldn't do that. So the focus is on two things. It's is there a violation of international law? Here we're beginning an event of torture. Sorry. Not alleged. Certainly not in San Jose. Must dismiss at that stage. And then the second question is, are there other considerations that should lead you to demand an especially strong connection to the United States? And where our government has said, you may export this technology, and where our government has said it's in the interest of the United States to build an open internet architecture in China, the Golden Shield, you know, it's not like the Golden Shield was built to go after Falun Gong. If you go to the EFF website, their friends on the plaintiff's side, you'll see they're being concerned about the Golden Shield as it's being used for censorship in China. So, Your Honor, don't allow this case to proceed. Don't read. You don't need to read Max Rea to affirm. You can stop Rea looking at the paragraphs I've cited to you and say, I'm sorry, you didn't get this case into San Jose with anything other than conclusory paragraphs, and you're done. You don't have to read Jack D'Souza or Manzrea. Judge Berzon, you can assume, for purposes of the extraterritoriality analysis, that there might be a foreign law violation, if it had been particularly pledged to San Jose, but it isn't. So affirm, wait for our bank. At worst, send back for us to discuss the export control technology under the justicial contradictibility arguments. But whatever you do, cease and reverse. Thank you, Your Honor. Your Honor, I just thought I was talking about another complaint, because we have incredibly detailed allocations about knowledge, about purpose, about things that happen in San Jose. It's perhaps just those people of sight, so that had a role to play in that response. With respect to Pioble, with respect to the extraterritoriality issue of things that happen in the United States, we would respectfully assume, look, paragraphs 58, 62, 88, 166, 178, 174. I can send you a letter with all the paragraphs and lay them out in terms of where all these come from, but that's been a problem in this case, with the other side talking about a complaint that's different from the one that we have. In fact, Clause of Action 6 talks about crimes against humanity, religious persecution. The other thing is that with respect to the aiding and abetting, we have all those allegations about knowledge not accessed from public sources. And by the way, it's not media reports. We're talking about the State Department. The State Department of the United States has said this. That's something that they have to take into account. The U.N. has said it. Amnesty International has said it. Human Rights Watch has said it. Not just the media. Everybody knows what's going on in this. And we're not talking about handfuls. We're talking about thousands of people that have been tortured. Thousands of people have been disappeared. We're talking about horrible human rights violations. And it wasn't just the Golden Shield. They didn't sell the Golden Shield for just the crime control technology. They sat down with the Chinese, and the Chinese wanted features in this system that would enable them to persecute the fallen God in those ways that everybody knew they were doing. That's what they wanted. That's what they got. They may not like the fact that they're tired with it, but they knew it. Even Mr. Chandler testified in Congress that he knew what they were using it for. He just said that wasn't their intent. But that's not enough. And I would suggest from Nuremberg on, Judge Weinberg's hypothetical is not a hypothetical. It's the Heisengrupen case. In the Heisengrupen case, a man was found guilty for providing lists of communists knowing that they would be killed by the Nazis. So you can have a case based on knowledge, and the act of Straus being substantial assistance and the substantial assistance being creative assistance that enables you to get more fallen God members into this system of persecution. That's what they did. They enabled the Chinese to find 90% of the fallen God, and they put it in their marketing material. They were better than anybody else because they could find more fallen God members to put into this system of persecution. That's what they did. And that's what the complaint alleges, not what Ms. Sullivan talks to you about. And with respect to Kiobel, first of all, RGI didn't decide, didn't overturn Kiobel. Kiobel decided what the test was when the next step past finding meant that ATS was subject to the presumption. It actually wasn't subject to the presumption. It was subject to the principles underlying the presumption because it's not a regulation or a statute regulating conduct. And so what Kiobel says is if something, if an ATS plant touches or concerns U.S. territory with sufficient force, then the presumption is displaced. Circuits are all over the place. There's a split in the circuits about it. Well, RGI just seems to use fake Trump's language. It isn't right. I don't know if it helps a lot of business, but I think that so in the context of the discussion, the answer is it concerns the United States. But I think my point, I guess, is that RGR was a traditional application of a presumption against territoriality in the sense that we go as a country. So the presumption relies directly on Kiobel and recognizes the ATS situation and recognizes that it's jurisdictional and still uses the FOCUS language. But it doesn't say what the FOCUS is under ATS. And it doesn't tell you that the FOCUS test necessarily applies to the ATS because the majority in Kiobel said that the test was special concern. And so, and that's a different test. And that's why in my first head up, I said that I think Al-Shamarian is the more appropriate analysis. You can look to the dissent in the Kiobel case. I mean, there's obviously a split over what the proper analysis is. But even if you found that this work. I think there is a category of cases in which de-leading and abetting criteria were met in the United States. But it's still a judiciary. If they were met and they were found to be assertive, I don't believe there's a. She seemed to be. When I said why it was a start, it was because I'm just going with the aiding and abetting person, not necessarily because she understands that there could be cases in which the aiding and abetting standards are met. But nonetheless, there's still various reasons to obey the ATS in the case. I don't believe that's the case here. I think that the cases that she was referring to are primarily Mustafa and Balintulo. In Mustafa and Balintulo, the Second Circuit, in both cases found that the textual consent test was met. But the plaintiffs did not satisfy the purpose standard as understood in the Second Circuit, which I would respectfully request that this court not adopt by the Second Circuit. The clause looks something much closer to specific intent. So it seems, according to your theory, de-leading and abetting suproms are totally dispositive because if they had not been heard, it erodes in the design process and not through something else. And they grew here and stuff. That's right. And our position is that if you find some allegations related to what happened in San Jose and what Cisco did here and directed here, that is abetting under customary international law. And you have no extra territory of the propriety trial, even under the Alito position. I remember in Kiobo, it was only the Justice Alito that asserted the test that Ms. Sullivan asked me to adopt. Justice Breyer, for four justices, said U.S. citizenship's enough. There were hopes. So it's not clear what textual consent means. It's not clear whether five members of the court would adopt what Justice Alito said. Justice Kennedy said there would be cases that would require further elaboration. And at some point, the court's going to have to decide between these lines and cases on the presumption against extra territoriality. But I would urge the court to look at our complaint in full, because that is where you get the information about the fact that there's a abetting here under international law that took place, even if you only look at what happened and what Cisco did in California. And it is not the case that any tech company is going to be hurt by this. This is what Cisco did. There's no information before the court than anybody else. And specifically, God designed this system knowing that it would lead to the mass torture and killing and disappearance of a religious group. Suppose you had totally undifferentiated software that they sold to China. And everybody else swirled. And they knew China was doing this. I think that would be a good point to express. And I think that the fungibility question, there are cases that find that fungible bits can be the basis for international law violations, like one being this perfect example of that. If you sold machetes to the local police force in Rwanda. You sold out to a group of Apple computers, and then people on Twitter are using Apple computers. You hang out with CR, you know that they're using Apple computers, and they're figuring out who the hell in hell is. Well, I think that whether or not it would be a violation would be contextual. And I think it's a much harder case if all you're selling is generic goods. But this is not generic goods. These are goods that they specifically worked with the Chinese to advance the anti-fungibility agenda that they knew of. And there are admissions in their documents, which we have. This case is based on Cisco documents, reports of experts on a solid basis of information, such as something that is not used by merchants. So I hope that the court will find that these allegations are sufficient to overcome this facility. Thank you. Thank you. Thank you both very much. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Reinhardt, Tashima, Berzon